#29766-aff in pt & rev in pt-PJD
**2022 S.D. 62**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

LISA MURPHEY,                                         Plaintiff and Appellee,

v.

JARED PEARSON,                                       Defendant and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
MEADE COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE KEVIN J. KRULL
Judge

\* \* \* \*

KASSIE MCKIE SHIFFERMILLER of
Lynn, Jackson, Shultz & Lebrun, P.C.
Rapid City, South Dakota                    Attorneys for defendant
                                            and appellant.


ROBERT D. PASQUALUCCI
Rapid City, South Dakota                    Attorney for plaintiff
                                            and appellee.

\* \* \* \*

CONSIDERED ON BRIEFS
APRIL 25, 2022
OPINION FILED **10/19/22**

#29766

DEVANEY, Justice

[¶1.]    Lisa Murphey and Jared Pearson were in a romantic relationship and lived together from 2009 until February 2020.  They never married, but they had a child together.  When their relationship ended, Lisa instituted an action to determine custody, child support, and shared parenting.  Jared counterclaimed for breach of an implied contract and unjust enrichment, asserting that the parties had impliedly agreed that the couple would jointly own the home and Jared would receive his share of the equity in the home acquired by virtue of his financial contributions toward the home mortgage.  In her reply, Lisa denied that such an agreement existed, claiming instead that she owned the home and that Jared only paid her rent while living there.  The circuit court, after a bench trial, denied Jared's claims; concluded that Lisa and Jared's relationship was that of a landlord and tenant and awarded Lisa back rent; and determined shared parenting and child support issues.  Jared appeals, raising multiple issues.  We affirm in part, reverse in part, and remand.

## Factual and Procedural Background

[¶2.]    In 1995, Jared and Lisa met while attending high school in Britton, South Dakota.  They lost touch after graduation but reconnected in 2008 and began a long-distance, romantic relationship.  At the time, Jared was living in Aberdeen, and Lisa was living in Sturgis in a mortgaged home with her two children from a previous relationship.

[¶3.]    In December 2009, Jared moved to Sturgis to live with Lisa and her children.  He worked as an optometrist and paid Lisa $500 per month for what he

-1-

characterized as his contribution to household expenses. Lisa testified that they "didn't really have an arrangement" and that the $500 a month Jared "chose to pay . . . included his room, board, his food, toiletries." She characterized these payments as "rent."

[¶4.] In 2012, while Lisa and Jared were still living together, their son, B.P., was born. Lisa testified that their relationship was strained at this time, but she attempted to make it work for the sake of their child. The following year, Lisa and Jared decided to move away from Sturgis. Jared had plans to open an optometry business in Rapid City, and Lisa, who was working as an audiology technician and for the South Dakota National Guard, hoped to work in Rapid City at some point.

[¶5.] After looking at homes with Jared and her family members, Lisa decided to sell her home in Sturgis and purchase a home in Summerset, South Dakota. According to Jared, the couple considered multiple financing options but opted for a loan through the Department of Veterans Affairs (VA) because it had the most favorable terms. Jared further claimed that the loan could only be obtained in Lisa's name because Jared was not a veteran of the armed forces and was not married to Lisa. According to Lisa, she alone decided to obtain the VA loan after Jared told her he was not interested in contributing to the purchase of the home because he did not want the debt and was trying to open his own optometry practice.

[¶6.] In September 2013, Lisa closed on the purchase of the home. Jared did not attend the closing and did not contribute to any of the associated costs. Lisa used the proceeds from the sale of her home in Sturgis to personally pay $1,000 as

earnest money and $1,467 in closing costs. Jared's name is not on the deed. Lisa obtained a homeowner's insurance policy in her name only, and Jared obtained a renter's insurance policy.

[¶7.] After the two moved into the Summerset home, Lisa began presenting Jared with monthly statements of expenses and asked him to pay half of the total amount listed. These statements included expenses such as the water bill, garbage bill, B.P.'s daycare bill and insurance premium, electric bill, mortgage payment, groceries, internet or television provider bill, and other miscellaneous expenses. Some of the monthly statements included amounts incurred for purchasing gifts for B.P. Lisa explained that she did not include her personal expenses or expenses incurred for her other two children.

[¶8.] According to Jared, the couple's financial arrangement made it "easier for one individual to pay [all of the expenses] rather than to have each of [them] paying things and then try to keep track of everything and come to some conclusion on who owed who[m] what." In his view, Lisa oversaw the finances and made the decisions as to what was included and what was not. Jared claimed that "[f]or the most part," he paid the amount Lisa requested, but he admitted that some months he did not pay any amount or only partially paid the amount on the statement. He explained that in 2014, he and three other optometrists started an optometry practice in Rapid City, which for the first few years, reduced his income stream. He asserted that when his income became more stable, he contributed more than what Lisa requested during a given month, which he believed made up for months he did not fully contribute.

[¶9.]     In August 2016, Lisa refinanced the loan on her home.  She claimed that she had to do so to stay current on the bills because Jared had not been contributing his share of the household expenses.  Jared, in contrast, claimed that the couple jointly made the decision to refinance.  It is undisputed that Jared did not attend the closing or contribute to the $500 closing cost when Lisa refinanced.

[¶10.]     While they lived in the Summerset home, both parties contributed funds and labor for improvements.  Jared claimed that he installed a camper pad and sandbox, did landscaping, stained the fence and deck, and built raised garden beds and garage cabinets.  He asserted that he personally paid for some of the expenses for these projects and some of the expenses Lisa paid were included on the monthly statements she provided to him.

[¶11.]     According to Lisa, in 2015, the couple's romantic relationship had ended, and she asked him many times to move out, but he refused to do so.  Both parties testified that Jared started sleeping on the couch at this time.  Lisa further testified that in November 2019, while Jared was still living in the home, she consulted with an attorney about evicting Jared.  The attorney drafted an eviction letter, but Lisa did not commence an official eviction action.  However, she did file a petition to establish paternity, child custody, parenting time, and child support.

[¶12.]     In February 2020, Jared moved out of the home.  In his initial answer to Lisa's petition, Jared did not dispute paternity or Lisa's proposed joint legal custody of B.P.  However, he believed he was entitled to 50% of the accrued equity in the home, and in December 2020, he filed an amended answer asserting counterclaims for, among other things, breach of implied contract and unjust

enrichment.[1]  He alleged the parties had agreed that the purchase of the Summerset home was a joint purchase and that they would jointly pay the monthly mortgage.  He claimed that from September 2013 until February 2020, he contributed 50% to each month's mortgage payment by reimbursing Lisa directly.  He further claimed that Lisa's acceptance of these payments indicated assent to be bound by an implied contract whereby he would receive a commensurate share of the accrued equity in the home in exchange for his payments.  Alternatively, he claimed it would be inequitable to allow Lisa to retain his payments without him being awarded his share of the accrued equity.

[¶13.]     In reply to his counterclaims, Lisa denied that the purchase of the home was to be a joint purchase.  She claimed Jared "was not involved in any aspect of the purchase."  She further asserted that Jared "was supposed to pay rent but often could not" and "[t]here were many months that [he] did not pay his rent."  In her prayer for relief, she requested that Jared's counterclaims be dismissed with prejudice and that she be awarded "such other and further relief as the [c]ourt deems just and equitable in the premises."

[¶14.]     During a one-day trial to the court, Lisa testified that Jared should not be awarded 50% of the accrued equity in the home because, to her, his payments were "the expenses of him living there, his food, room, board."  Lisa further testified that Jared had an option to be part of the purchase of the home but chose not to,

---

1.     Jared also asserted that Lisa breached two additional implied contracts—one related to the accrued equity in a vehicle and another related to the accrued equity in a camper—and alternatively, that she was unjustly enriched by his payments for the vehicle and camper.  None of these claims are at issue on appeal.

and as a result, the debt was hers and if she became delinquent on the loan, "he could pack his bags and walk out." During cross-examination, she was asked whether "the renting concept" was "ever discussed[.]" She replied, "No." She agreed that there was no lease agreement and that she never reported rental income on her taxes, but she disagreed that there was an agreement that Jared would pay half of the mortgage.

[¶15.] Jeannine Lecy testified as an expert witness for Lisa. Lecy had examined Lisa's and Jared's finances, including each party's bank and credit card statements and Lisa's Quick Books reports. Based on her examination, she concluded that between September 2013 and February 2020, Jared did not make payments for ten months and made only partial payments for 24 months. She explained that she did not have the handwritten statements Lisa had given Jared each month listing his amount due, so she "estimated what the rent would be by the payments that were made for that year." Lecy concluded that Jared owed, but did not pay, a total of $22,084 between September 2013 and February 2020. This amount reflects $5,014.56 due from what Lecy considered to be partial payments and $17,069.59 due from the months in which she believed that he made no payment.

[¶16.] Jared testified that he never believed he was paying "rent" while living in the Summerset home. Rather, he "felt [they] were paying for the house" as joint owners and that they were "together as a family[.]" As further support that he was not paying "rent," Jared testified that Lisa did not take "specific actions" when he could not pay his share of the expenses.

[¶17.] At the conclusion of the case, the circuit court took the matter under advisement and directed the parties to submit proposed findings of fact and conclusions of law. Both parties submitted proposals, and thereafter, the court issued findings and conclusions (later amended), addressing shared parenting time, child support, and Jared's counterclaims.

[¶18.] The court made findings related to the parties' relationship and living arrangement, and in regard to Jared's counterclaims, the court concluded that Lisa and Jared did not have an implied contract in which Jared was an equity owner in the Summerset home.[2] Rather, the court found that the nature of their relationship in "the new home was a continuation of the relationship the parties operated under while in the Sturgis home" and was one in which "Lisa provided Jared a place to stay and other amenities with the expectation of reasonable compensation for the service." The court also determined that Jared failed to prove his claim of unjust enrichment because he did not prove that Lisa was unjustly enriched by his payments to her or his improvements to the property. In addition to ruling against Jared on his counterclaims, the court further held that an implied landlord-tenant contract existed between Lisa and Jared and awarded Lisa $17,069.59 plus 10% interest in back rent.

[¶19.] Jared appeals, and his issues are restated as follows:

---

2. The court included an alternative conclusion that *if* Jared would be entitled to a portion of the home's equity, such amount must be offset by amounts Lisa paid for the initial purchase and for the refinancing of the home as well as the amounts Jared owed for unpaid rent. Although Jared challenges this conclusion, given our resolution of his underlying claim, we need not consider this alternative ruling.

1.  Whether the circuit court erred in finding that there was no implied contract affording Jared a joint interest in the Summerset home.

2.  Whether the circuit court abused its discretion in denying Jared's claim for unjust enrichment.

3.  Whether the circuit court erred in awarding Lisa back rent.

4.  Whether the circuit court erred in determining the amount of back child support due.

## Analysis and Decision

### 1.  Whether the circuit court erred in finding that there was no implied contract affording Jared a joint interest in the Summerset home.

[¶20.] Jared contends that the circuit court's factual findings are insufficient to support the determination that there was no implied contract in which the parties agreed that he had a joint interest in the home such that he would be entitled to a share of the home equity.[3] In particular, he maintains that because the court acknowledged that he and Lisa had discussed financing options for the purchase of the home, "[t]his could only be an indication that the parties intended to be joint owners of the Summerset home, entitling [him] to equity in the same." He also contends the court clearly erred in finding that the living arrangement in Summerset was a continuation of the couple's arrangement in Sturgis. According to

---

3.  In her brief on appeal, Lisa contends that Jared's breach of implied contract claim fails as a matter of law because, in her view, the statute of frauds required the agreement to be in writing. However, she did not raise this defense in her pleadings or at trial; thus, she cannot raise it for the first time on appeal. *See Farmers Co-op Elev. Co. of Revillo v. Johnson*, 90 S.D. 36, 42, 237 N.W.2d 671, 674 (1976) (applying SDCL 15-6-8(c), which requires a party to affirmatively plead a statute of frauds defense).

Jared, the landlord-tenant arrangement in Sturgis changed when they moved to the Summerset home because after moving to Summerset, he did not pay the same amount each month as rent like he did in Sturgis. He notes that, instead, Lisa gave him monthly statements identifying the household expenses, including the mortgage, and he paid his share. Jared also notes that he made contributions toward home improvements.

[¶21.]     "A contract is either express or implied." SDCL 53-1-3. "A contract is implied in fact where the intention as to it is not manifested by direct or explicit words by the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used, or acts done by them, or other pertinent circumstances attending the transaction." *Setliff v. Akins*, 2000 S.D. 124, ¶ 12, 616 N.W.2d 878, 885 (quoting *Weller v. Spring Creek Resort, Inc.*, 477 N.W.2d 839, 841 (S.D. 1991)). "[A]s a general premise, the 'existence of a valid contract is a question of law.'" *Wright v. Temple*, 2021 S.D. 15, ¶ 27, 956 N.W.2d 436, 446 (quoting *Koopman v. City of Edgemont*, 2020 S.D. 37, ¶ 14, 945 N.W.2d 923, 926). However, if the existence and terms of a contract are in dispute, as they are here, those questions are for the fact finder. *Id.* This Court reviews the circuit court's findings of fact for clear error. *Icehouse, Inc. v. Geissler*, 2001 S.D. 134, ¶ 21, 636 N.W.2d 459, 465.

[¶22.]     The circuit court's findings of fact and conclusions of law (many of which are actually findings of fact) support its determination that Lisa and Jared did not intend, by their conduct, to enter into an implied agreement for a joint ownership interest in the home. Although the monthly contributions Lisa requested

from Jared after they moved into the Summerset home varied as compared to Jared's $500 monthly contribution when they lived in Sturgis, Jared has not established that the court clearly erred in finding that the couple's living arrangement in Summerset was a continuation of their arrangement in Sturgis and was not one of joint ownership. The court based this finding on "the conduct and other acts done by the parties as well as the pertinent circumstances attending the transaction in purchasing the Summerset home." As the court observed, Jared paid rent while living in Sturgis and did not seek an equity share of that home when it sold. The court also noted that Jared had obtained renter's insurance in Sturgis and similarly obtained renter's insurance after Lisa purchased the Summerset home. The court further found, consistent with Lisa's testimony, that Jared declined to sign on as a purchaser of the Summerset home "to save his money and credit to further expand his optometry practice." Finally, the court considered that Jared did not have his name placed on the deed; did not participate in the closing; did not assist in obtaining homeowner's insurance; and did not participate in or contribute any funds toward the refinancing.

[¶23.] Jared's arguments on appeal, which relate primarily to the reasons he offered for why he proceeded as he did, essentially challenge the weight the court afforded to particular evidence. But under the clearly erroneous standard of review, this Court is "not free to retry the case as if it had never been heard before." *Melstad v. Kovac*, 2006 S.D. 92, ¶ 6, 723 N.W.2d 699, 702 (citation omitted). Rather, we view the evidence as a whole "in a light most favorable to the court's findings, and 'we give due regard to its opportunity to observe the witnesses and the

evidence first hand.'" *Bruggeman v. Ramos*, 2022 S.D. 16, ¶ 51, 972 N.W.2d 492, 509–10 (citation omitted). From our review of the evidence, the circuit court did not err in finding that there was no implied agreement between the parties for joint home ownership such that Jared and Lisa would share the acquired equity in the Summerset home.

### 2. Whether the circuit court abused its discretion in denying Jared's claim for unjust enrichment.

[¶24.] Jared contends that "[i]f it was never [Lisa's] intention to acknowledge [his] equal ownership interest in the house, then retaining his payment of half of all expenses is inequitable because [his] share of the household expenses was less than [Lisa's] share." Noting that five people were living in the home (Jared and Lisa, B.P., and Lisa's two children from her prior relationship), he claims that "his true 'share' of the mortgage and other expenses" would not have been one half of the monthly total. Rather, in his view, to be equitable, his share should have only been "the expenses associated with himself and half of B.P.'s expenses."

[¶25.] In response, Lisa contends that she was not unjustly enriched by Jared's payments. She asserts that contrary to Jared's view, he did not pay half of the monthly expenses or half of the mortgage payments; instead, he only paid approximately 25% of the expenses from September 2013 to January 2020.

[¶26.] Because of our determination that no implied contract for joint home ownership exists defining the parties' rights and obligations, Jared is without an adequate remedy at law and may proceed in equity via his unjust enrichment counterclaim. *See Johnson v. Larson*, 2010 S.D. 20, ¶ 11, 779 N.W.2d 412, 416–17 (concluding that an equitable remedy is only available when there is no contract

controlling the parties' relationship); *see also Paweltzki v. Paweltzki*, 2021 S.D. 52, ¶ 42, 964 N.W.2d 756, 769. "Unjust enrichment is an equitable concept[,]" and we review a circuit court's decision to grant equitable relief for an abuse of discretion. *Dowling Family P'ship v. Midland Farms*, 2015 S.D. 50, ¶ 10, 865 N.W.2d 854, 860 (citation omitted). However, "[p]ursuant to an abuse of discretion standard of review, factual determinations are subject to a clearly erroneous standard." *Gartner v. Temple*, 2014 S.D. 74, ¶ 8, 855 N.W.2d 846, 850 (citation omitted). As the Court explained,

> The question is not whether this Court would have made the same findings that the trial court did, but whether on the entire evidence we are left with a definite and firm conviction that a mistake has been committed. . . . Doubts about whether the evidence supports the court's finding of fact are to be resolved in favor of the successful party's version of the evidence and of all inferences fairly deducible therefrom which are favorable to the court's action.

*Id.* (quoting *In re Estate of Olson*, 2008 S.D. 97, ¶ 9, 757 N.W.2d 219, 222).

[¶27.]      "Unjust enrichment occurs 'when one confers a benefit upon another who accepts or acquiesces in that benefit, making it inequitable to retain that benefit without paying.'" *Hofeldt v. Mehling*, 2003 S.D. 25, ¶ 15, 658 N.W.2d 783, 788 (citation omitted). Thus, to prevail on his claim for unjust enrichment, Jared was required to prove that Lisa received a benefit, that she was aware she was receiving a benefit, and that it would be inequitable to allow her to retain the benefit without reimbursement to Jared. *See id.* ¶ 16. Further, as the appealing party, Jared must establish that the circuit court's findings of fact are clearly erroneous.

[¶28.] A review of the record supports the court's findings that Lisa received a benefit from Jared's contributions toward the household expenses and improvements and was aware she was receiving a benefit. However, the record also supports the circuit court's finding that Lisa was not *unjustly* enriched by the payments she received from Jared or from his improvements made to the property. The court found that Lisa provided the majority of the funds and labor toward the home improvements. The court further considered that Jared paid only 20% (more accurately 25%)[4] of the household expenses during the time he lived in the Summerset home and deemed noteworthy the fact that a portion of Jared's payments went to his obligation to pay expenses for his minor child. The court also noted that Lisa had to refinance her home and found this was necessary because Jared failed to pay his full share of the monthly expenses. None of these findings are clearly erroneous.

[¶29.] While Jared maintains it would be inequitable to allow Lisa to retain the benefit of his payments, he ignores that he also received a considerable benefit because of the parties' living arrangement. In exchange for his payments, Lisa provided him and their child a place to live and necessities while she assumed all of the financial risk. Based on a review of the evidence and the circuit court's findings,

---

4. The circuit court determined that from September 2013 to January 2020, Lisa paid $627,140.27 in total household expenses and Jared reimbursed her for $126,036.27 of these expenses. Using the $627,140.27 number, the court determined that Jared only contributed 20% toward the total household expenses. However, the parties agree that the court's 20% calculation is erroneous because Lisa only paid a total of $501,104. The court incorrectly added the amount Jared paid ($126,036.27) to Lisa's $501,104 to arrive at this higher total expenditure by Lisa. When using $501,104 as the total amount Lisa paid, Jared's $126,036.27 contribution was 25%.

the court did not abuse its discretion in denying Jared equitable relief on his claim of unjust enrichment.

### 3. Whether the circuit court erred in awarding Lisa back rent.

[¶30.] As to the award of back rent to Lisa, Jared asserts that at no point prior to or during the trial did Lisa raise, as a claim to be decided by the court, that the parties entered into an implied landlord-tenant contract. He acknowledges that Lisa's pleadings and the evidence at trial indicate that Lisa believed Jared was a mere tenant and that Lisa requested back rent in her proposed findings of fact and conclusions of law after the trial. However, he notes that Lisa initiated this suit as one to establish paternity, custody, child support, and shared parenting time and, that she did not, when he asserted counterclaims against her, request to amend her complaint to add this implied contract claim. He therefore maintains that it was improper for the circuit court to find a valid implied rental contract and to award back rent.[5] He further claims that he was prejudiced because he had no notice that he would be required to respond to such a claim and "was not given a legitimate opportunity to contest the claim" with evidence.

[¶31.] In response, Lisa claims that "[i]t is clear from the proceedings and pleadings . . . that 'rent' and the issues of the nature of the relationship between the

---

5. Jared filed an objection to Lisa's proposed findings and conclusions that "the only implied contract in place was that of a renter in [her] home" and that Jared owed Lisa $17,069.59 in back rent. He asserted that her failure to plead any claim for breach of contract and her failure to move to amend her pleadings prior to or during trial precluded such relief. The circuit court did not specifically rule on this objection but effectively denied it by adopting most of Lisa's proposed findings and conclusions.

parties was going to be raised at trial." She then directs this Court to the pre-trial checklist she submitted to the circuit court, wherein she related that an issue remaining for trial included "[w]hether Jared Pearson is entitled to any portion of Lisa's house" in Summerset and the sub issue of "[a]mount to be offset if [the c]ourt deems Pearson has any actual ownership." She also notes her repeated references, in her reply to Jared's counterclaim, to "rent" and Jared's failure to pay it. In regard to the trial, she directs this Court to her testimony wherein she called Jared's payments "rent" and referred to their living arrangement as a landlord-tenant relationship. She also relies on the evidence she offered showing that Jared did not fully pay his share of expenses while living with her. Thus, in her view, the issue of an implied landlord-tenant contract was raised and tried, and as a result, the circuit court could award her back rent.

[¶32.] Under SDCL 15-6-15(b), "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues."

[¶33.] While this Court has said that the decision to allow an amendment of the pleadings is reviewed for an abuse of discretion, *see Wasserburger v. Consolidated Management Corp.*, 502 N.W.2d 256, 261 (S.D. 1993), Lisa did not move to amend her pleadings to add her implied contract claim. Therefore, the

question here is whether the issue of an implied landlord-tenant contract was tried by express or implied consent of the parties. As the Court has said, a failure to formally plead a claim or make an amendment to a pleading "is immaterial if the issue was tried by express or implied consent." *American Prop. Servs., Inc. v. Barringer*, 256 N.W.2d 887, 890 (S.D. 1977), *superseded on other ground by statute as recognized in Orr v. Cook*, 2001 S.D. 31, 800 N.W.2d 353. Whether an issue was tried by express or implied consent requires a review of the record. *Id.* (examining the record as a whole to determine whether the issue was tried by implied consent); *All Star Const. Co., Inc. v. Koehn*, 2007 S.D. 111, 741 N.W.2d 736 (same); *Oesterling v. Oesterling*, 354 N.W.2d 735 (S.D. 1984) (same).

[¶34.] In *Barringer*, the Court noted that SDCL 15-6-15(b) is similar to the federal rule and after reviewing federal cases determined that: "The test for allowing an adjudication of an issue under FRCP 15(b) and SDCL 15-6-15(b) tried by implied consent is whether the opposing party will be prejudiced by the implied amendment, i.e., did he have a fair opportunity to litigate the issue, and could he have offered any additional evidence if the case had been tried on the different issue." 256 N.W.2d at 891. If "there has not been a fair opportunity for a party to be heard on the issue and/or additional evidence could have been offered, any implied amendment would be prejudicial and no trial by implied consent exists." *Id.* (holding that "it would be very prejudicial to the plaintiff to construe defendant's passing references in the depositions and trial brief to plaintiff's inadequate efforts as a trial by implied consent of the defense of failure of consideration"); *see also All Star Const.*, 2007 S.D. 111, ¶¶ 20–21, 741 N.W.2d at 742 (reversing award of

specific performance because "the issue was initially raised by the trial court when it delivered its ruling from the bench" and upon earlier notice, a party may have presented evidence related to the new remedy); *Osterling*, 354 N.W.2d at 737.

[¶35.]     A review of the pleadings, trial testimony, and other record evidence does not support that Jared and Lisa agreed to litigate the question whether they entered into a valid landlord-tenant contract such that the circuit court could award Lisa past due rent. Lisa did not expressly plead, in either her complaint or her reply to Jared's counterclaim, that such an implied contract existed, and she did not in either pleading request an award for past due rent. Further, while the pleadings and Lisa's trial testimony certainly support that she believed Jared was a tenant in her home, she offered this evidence to dispute Jared's claim that he was entitled to some of the equity in her home. Also, although Lisa presented detailed evidence and expert testimony evincing that Jared failed to pay what she called "rent," this evidence related to her alternative claim that *if* the court were to award Jared an equity interest in the home, his failure to fully contribute to the monthly expenses should result in an offset for amounts unpaid.

[¶36.]     Notably, the following exchange occurred when Lisa was specifically asked during cross-examination: "[Y]ou're not making any claim for unpaid rent, correct?"

> **Answer:** Do I - - I guess I don't know what you're trying to say. I mean, I - -
>
> **Question:** Are you requesting that Jared pay you all of the back rent that you believe he hasn't paid?
>
> **Answer:** If indeed he - - if indeed you truly think he is a part-owner of the home, but I don't believe he's a

> part-owner of the home, so I don't - - I mean, if he believes he wants half the equity in the house, then I believe he should pay for the unpaid expenses in the last 14 months he hadn't lived there . . . .

**Question:** Well, I understand your position, but that wasn't my question. My question was, are you seeking to be paid back for payments that Jared didn't pay to you?

**Answer:** If indeed he's part-owner of the home, then I would expect for him to pay that back, yes.

**Question:** So what you're asking the judge to do is if the judge agrees that Jared is part-owner of the home and is entitled to some equity, you are asking for his equity to be reduced by the amount that he owes you?

**Answer:** Absolutely.

Nothing in this exchange indicates that Lisa was seeking an award of back rent in the event the circuit court found that Jared was *not* entitled to an equity interest in the home.

[¶37.]     Importantly, as multiple federal courts have explained, "an issue has *not* been tried by implied consent if evidence relevant to the new claim is also relevant to the claim originally pled." *Kehoe Component Sales Inc. v. Best Lighting Prods., Inc.*, 796 F.3d 576, 595 (6th Cir. 2015) (emphasis added) (quoting *Douglas v. Owens*, 50 F.3d 1226, 1236 (3d Cir. 1995)); *accord Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1217 (10th Cir. 2000) (concluding that evidence was relevant to issues already being tried and party did not have notice that a new issue was being raised); *Reynolds v. Tangherlini*, 737 F.3d 1093, 1106 (7th Cir. 2013) (explaining that "a court will not imply a party's consent to try an unpleaded claim 'merely because evidence relevant to a properly pleaded issue incidentally tends to establish

an unpleaded claim'"); *Diaz v. Jaguar Rest. Grp., LLC*, 627 F.3d 1212, 1215 (11th Cir. 2010) (noting that "[t]he introduction of evidence arguably relevant to pleaded issues cannot serve to give a party fair notice that new issues are entering the case" (citation omitted)).

[¶38.]     "The reasoning behind this view is sound since if evidence is introduced to support basic issues that already have been pleaded, the opposing party may not be conscious of its relevance to issues not raised by the pleadings unless that fact is specifically brought to his attention." *Fleck v. Jacques Seed Co.*, 445 N.W.2d 649, 652 (N.D. 1989) (emphasis omitted) (citing a source quoting 6A Fed. Prac. & Proc. Civ. § 1493 (3d ed.)).  Therefore, "[i]t must appear that the parties understood the evidence to be aimed at the unpleaded issue." *Kehoe*, 796 F.3d at 595 (quoting *Yellow Freight Sys., Inc. v. Martin*, 954 F.2d 353, 358 (6th Cir. 1992)).  "Otherwise, the court runs the risk of violating the defendant's procedural due process rights by imposing judgment upon a claim against which the defendant did not know he had to defend himself." *Id.*

[¶39.]     Similarly here, because Lisa has not identified anything in the pleadings or trial record establishing that the parties understood that the evidence she relied on in defense of Jared's counterclaims would also be used to prove a separate unpled breach of contract claim and corresponding award of damages, the question whether the parties entered into an enforceable landlord-tenant contract

was not tried by implied consent.[6]  Therefore, the circuit court erred when it

awarded Lisa back rent.

### 4. Whether the circuit court erred in determining the amount of back child support due.

[¶40.]     The circuit court issued two conclusions related to back child support.

Conclusion of law #46, which was proposed by Lisa, states that Jared owes Lisa

"back child support for the 14-month period between February 2020 and March

2021, inclusive, in the amount of $2,730, (which amount is the calculation of 14

months x $195) with credit given for any amounts paid since March 2021."

Conclusion of law #99, which was proposed by Jared, states that "Lisa is entitled to

back child support in the amount of $1,064, which represents Jared's share of

[B.P.'s] insurance costs for 13 months.  Jared shall be given credit for any payments

made since March 1, 2021."[7]

[¶41.]     Notwithstanding the fact that Jared proposed the language in

conclusion #99 suggesting that $1,064 *represents* his share of B.P.'s insurance costs,

---

6.    Lisa notes that even though she did not demand such relief in her complaint, she "did not clearly state that she did *not* want back rent," and thus, in her view, assuming an implied tenancy contract exists, the court could award such relief under SDCL 15-6-54(c).  Under SDCL 15-6-54(c), "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, *even if the party has not demanded such relief in his pleadings.*"  (Emphasis added.)  However, in *Barringer*, the Court said that "the relief to be granted under SDCL 15-6-54(c) is not unlimited, and such relief must be based *upon the facts alleged in the pleadings and justified by the proof at trial.*"  256 N.W.2d at 892 (emphasis added).  Here, the circuit court's award of back rent was not based on the facts alleged by Lisa in her pleadings, nor was it justified by the evidence adduced at trial; therefore, such an award would not be warranted under SDCL 15-6-54(c).

7.    While conclusion #99 refers to 13 months, it appears the $76 amount was multiplied by 14 months (rather than 13) to arrive at the total of $1,064.

he contends on appeal that the circuit court erred in ordering that he pay $1,064 *in addition to* the amount ordered to be paid in conclusion #46. As Jared noted in his proposed conclusions to the court, the $195 monthly child support amount upon which the $2,730 award in conclusion #46 was based includes Jared's share of B.P.'s insurance costs. And a review of Jared's additional proposals reveals that his suggested $1,064 amount comes from his request that the court reduce the $195 monthly child support obligation to $76 per month because of financial hardship. Therefore, it is not clear what amount the circuit court intended to award.

[¶42.]     Aside from the fact that based on the parties' proposals, the $1,064 *includes*, rather than *represents*, B.P.'s insurance costs, it is further apparent that the circuit court, by adopting both Lisa's and Jared's proposed calculations, entered two competing and inconsistent child support awards. In fact, given her limited request on appeal that we affirm the court's determination that Jared owes her $2,730 in back child support, Lisa appears to concede that the court erred by ordering Jared to pay *an additional* $1,064. We thus remand the question of back child support for the circuit court to redetermine Jared's monthly child support obligation and recalculate the amount of back child support due. The court is also directed to issue amended findings and conclusions and an amended child support order.

[¶43.]     Affirmed in part, reversed in part, and remanded.

[¶44.]     JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur.